Ms. Van Aken. Good morning, Your Honors, and may it please the Court. My name is Christine Van Aken. I represent George Butterworth today. I'll be sharing my argument time with Mr. Quadra, who represents the other appellants in this appeal, and we would like to reserve some time for rebuttal. Two minutes, three minutes, what would you like? I think five minutes, Your Honor. Okay. I don't think anyone in this courtroom would deny that the job of prosecutors is very difficult. Prosecutors make difficult decisions about evidence, about charging, about witnesses, and they do so while balancing two competing interests, that of the state in securing criminal convictions and that of fairness to all citizens, including the defendant who has been charged with a crime. And so it's for that reason that we have a hard job with a complicated balancing test, that we provide absolute immunity to prosecutors. We want them to make their best decisions, to exercise their professional judgment without the threat of litigation or the fear of being second-guessed in a courtroom in civil litigation sometimes years later. When did Butterworth learn of Ricard's confession? May 17, 1991, while he was preparing a motion for new trial in the Tennyson case. Okay. And does the record tell us whether he thought that was relevant to the motion for new trial? Yes, Your Honor. The record tells us that he thought that it was relevant and that he immediately started, directed one of the police inspectors to investigate it and brought it to the attention of the Court and to Tennyson's counsel at the motion for new trial hearing that afternoon. Okay. And I don't believe that's disputed. The record on that is not disputed. So because of this difficult balancing test, there's a judgment that prosecutors have to make. But that, the nature of that decision and the difficulty of that decision does not change after trial. Just because a conviction has been secured does not mean that new evidence and new information is not arising about a conviction and about the legitimacy of that conviction. In fact, in a case where there's a gang investigation or where it's a gang-related homicide such as this one, a team of police detectives is often investigating related crimes. Some witnesses who testified in one case are being investigated for other things. There's new information that comes to the fore all the time. And often after conviction is when the rumor mill really sets in. And so because new information ---- It's not just the rumor mill in this case. You're right, Your Honor. It is not just the rumor mill. I mean, let's take an extreme example. Let's assume that a prosecutor becomes absolutely aware that someone didn't commit a crime and allows an execution to go forward, even though that prosecutor is no longer involved in the case. Still absolute immunity under your theory, right? Horrible case, Your Honor. And it is the case. It is absolutely the case that absolute immunity allows some prosecutors to do things that they undoubtedly should not do and not face civil liability for that. But the reason ---- but the nature of the offense, the horribleness of what the prosecutor has done, does not change the judgment that the ---- Doesn't the prosecutor's function change? Isn't that the critical inquiry? I mean, at that point, it may well be that the prosecutor is conducting the function of investigation, which would not be protected. Correct? If a prosecutor is conducting the function of an investigation, then the prosecutor is not absolutely immune, and that is not my argument. But in this case, Butterworth was undoubtedly not conducting an investigation. What was he doing? He was preparing for a motion for new trial in a related case. He was ---- With respect to the other defendant? Yes, Your Honor. Yes, Your Honor, with respect to Tennyson. And the evidence was brought to his attention by the police inspectors, not because he was conducting an investigation, but precisely ---- But we just want to separate these out. Now, with respect to that case, Judge Wilkin recognized immunity, right? Yes, Your Honor. Right. Now, so the question is, why should he get the immunity in this case when he's not acting as a prosecutor? In other words, he's not preparing, you know, for or to defend against a motion for a new trial. He is not preparing for any judicial proceeding currently, but that does not change his function. His function is to ensure the integrity of that conviction and to disclose exceptions. What do you mean, ensure? What does he have to do to ensure the integrity of that conviction? To evaluate newly discovered evidence and to disclose it if it is exculpatory and material. And I submit that that doesn't change, regardless of whether a conviction is final or not. And, in fact, if there had been no appeal going on at all, let's say that Goff's appeals were completely exhausted, his conviction was final for all purposes, then there would have been no attorney involved with his case, no attorney involved with preparing for a judicial proceeding related to his case. Under Goff's reasoning, in that case, there is no one with a duty to safeguard the integrity of that conviction. There is no one who retains a duty to protect the integrity of that judicial proceeding going forward. So here, if we want prosecutors to evaluate newly discovered exculpatory evidence, to make difficult decisions about it, and to turn it over if they need to, if it casts doubt on the legitimacy of a conviction, then we need to do the same thing with prosecutors that we give them during trial when they're making the same types of difficult decisions. Kennedy. Well, when you say he has a duty in spite of the fact that there is no, you know, pending motion, nothing like that, then suppose you carry your example further. Now, suppose he comes across, you know, something exculpatory that, in fact, he thinks convinces him of the defendant's innocence, what should he do? Initiate his own petition for habeas? What's his duty at that point? His duty is either to proceed to the court and confess error, or to turn it over to either the defendant himself or the defendant's counsel, if the defendant still has counsel. So you are you conceding he has that duty under law to turn it over to defense counsel? I do believe that the Brady duty extends after trial. Now, I don't think that that duty was clearly established in 1991, and that goes to the qualified immunity argument. But I think that the rise of exoneration proceedings and DNA evidence and defendants who are exonerated years later means that someone needs to have that duty, and the prosecutor who secured the conviction is the person most at risk. Did Putterwood move for summary judgment based on qualified immunity on the claim of failing to provide the Ricard confession? Your Honor, he did. His notice of motion indicated that he moved on all grounds for all conduct to which absolute immunity did not extend. And that's clear in his notice of motion. Now, there's a lot of claims that are being asked. Judge Wilken didn't say in her order that he didn't move? She did, Your Honor, and I believe that that was error. Yes. And in any event, regardless of whether Butterworth presented the claim properly below, this Court absolutely has discretion to reach a pure question of law. And in the Frye v. Melarengo case, the Court found that because immunity plays an important role in protecting government officials from having to stand trial, and because that immunity is lost if a case proceeds, that the Court in many cases will exercise its discretion to reach those points. Do you treat a failure to grant as a denial? A failure to grant? For the purpose of this interlocutory review, right? Yes, Your Honor. The failure to grant is a denial in this instance because this is summary judgment. There's nothing further. Trial is what happens. If Butterworth's qualified immunity on the Ricard confession were the only issue before us, and she says in her order that he didn't move, and you claim that she did, what would we do with that properly? Well, Your Honor, the Court does have discretion to reach it because it presents a pure question of law. The Court could also remand it to Judge — if the Court feels that Butterworth did properly raise it, has not waived it, the Court could also remand it to Judge given that it presents a pure question of law and that there are no factual issues involved here. The Court is — is equally well situated as the district court to make the determination. And, you know, given that the case — It's awfully hard to tell a district judge that when she says you didn't raise it, that you can say, well, you're clearly wrong on it, and there's some ambiguity. But even if — even if — Right. But, I mean, let's take your — the procedure you're advocating, if it's true, if he didn't raise it, would allow us to say, all right, let's pick off some issues of law that the district court hasn't considered and let's — let's just grant immunity on that. Now, we've — in some instances, I realize we've done that in more complex factual situations, but we don't usually. I understand that, Your Honor. All I'm putting out is that it's absolutely within the discretion of this Court and that there are good reasons to do it, i.e., that immunity is effectively lost if Mr. Butterworth has to stand trial. Your Honors, I want to reserve time for my co-counsel, so I'll hand over the platform to Mr. McQuadry. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Jim McQuadry. I represent Appellants Hendricks and Sanders, two former police officers of San Francisco that investigated the murder of Roderick Shannon. They were inspectors, weren't they? They were inspectors, and Mr. — Inspector Sanders then eventually became the chief of police, Your Honor. Appellees plaintiffs cannot show disputed material facts that Sanders or Hendricks caused a constitutional violation with bad faith intent and based on the facts known at the time. Given the limited time today, Your Honors, I'd like to focus on one of those elements, and that's the intent element, which is the overarching element for all the alleged evidence that was not allegedly produced. The trial court found that in dealing with intent, did not actually state what the standard was, but referenced Daniels. It is unclear, but then found that there were factual disputes and denied the issue of intent and said that was for the jury. However, in doing so, she ignored clear precedent from both the Ninth Circuit and other circuits. In particular, the issue in the Ninth Circuit is looked at by Cunningham. In that case, the Ninth Circuit found that bad faith was a factor and had to be considered. You could not have a constitutional violation without having bad faith. So that I'm clear, the two items we're talking about with respect to the former inspectors is the claim of failing to provide the Ricard confession and the suppression of the Smith statement? I believe, Your Honor, there are three factors. There is the secret witness memo, which was a request for a reward that allegedly was not produced. There is the Chante note, which is Chante Smith, the notation that is either cryptic by the court's review or was not produced. And finally, the Ricard confession being produced late. And as to each of those, Judge Wilkin denied summary judgment based on qualified immunity? Correct, Your Honor. And in dealing with each one of those, she looked at the issue of intent and what the intent required was for a constitutional violation when a police officer supposedly suppresses evidence. And the law, as stated both in Daniels, addressed the issue that for qualified immunity, in looking at intent, you must find something more than negligence. That was then expanded by the court in Youngblood, the Supreme Court, which found that where evidence was not gathered, the court must look to the intent required and found in that case, in a criminal context, that bad faith is required. The Ninth Circuit applied that standard in Cunningham, finding that in a 1983 case, you must have evidence of bad faith when there's no evidence that has been gathered. Also ñ But none of those involved a supposed Brady violation, right? Right. Youngblood was not a Brady violation, Your Honor. But Gene v. Collins in the Fourth Circuit applied Youngblood to a 1983 Brady case, finding that bad faith is required to show the intent that's required for a constitutional violation. But there's a reason why you would want to impose an intent requirement on a failure to gather information or allowing documents to be destroyed or evidence to be destroyed. It's entirely different when you have evidence in your possession, you don't disclose it. Well ñ Well, it seems to me that there is a difference. And we've never extended it to this ñ we've never extended that doctrine to these particular types of circumstances. That is correct. There's no Ninth Circuit case on point, Your Honor. But if you look at the Fourth Circuit and you look at the Eighth Circuit, they have done it. They've taken the Youngblood reasoning on bad faith and applied it to a 1983 case that involves failure to disclose evidence that has been gathered. And, Your Honor, the issue of whether there's a difference, what you're ñ if we set a standard that says if you don't gather evidence, you then have to show bad faith to defeat qualified immunity. But if you gather the evidence, if you show the good faith in investigating and gathering the evidence, then if it's not produced, then the standard is different. That doesn't make sense. How does that square, though, with the idea that we look at the objective circumstances in evaluating 1983? I mean, the argument's made all the time in certain cases where there's some evidence about the officer's subjective bad intent at the time. And the argument's made by people sitting in your position, oh, no, we have to look at objectively. We can't look at it subjectively. So aren't you blurring the subjective-objective standard? I mean, Your Honor, if you look at the Jeffers case, which involved two officer ñ two sheriff's deputies shooting at an inmate, the Court did exactly what you're saying. It said you have to look at motive. You have to look beyond the ñ just the allegations. You have ñ the plaintiffs in that case had a duty to present evidence regarding the motive. So in the sense of a due process violation, we depart of the subjective standard. Because you look at due process and you say you can't accidentally deny somebody due process and find that person liable under 1983 context. It is different than a Brady violation. So you have to look at intent. You have to look at motive. Daniel stands for that proposition. You can't just have negligence. You have to have something more. In this case, there is no facts that support anything other than negligence. If you take the facts, as Jeffers says, in the light most favorable to the plaintiffs, material facts, they have produced no evidence to show anything other than negligence, no motive evidence whatsoever. Back up a minute, Mr. Carter. State for me your position as to what an investigating police officer's constitutional obligation is under Brady. Under Brady, as a member of the prosecution team, the officer is to gather the evidence that supports what they believe is the criminal investigation and provide that to the district attorney's office, who then makes a determination ñ No, it is not up to the police officer. My question is, what is his Brady obligation? His Brady obligation is to turn over the evidence that they have gathered to the district attorney. That's where it ends. They do not make a determination of whether something is exculpatory and therefore subject to Brady. You mean all evidence? In other words, their entire file? Their entire file. Everything I know about this case, here it is. That's it. That's how officers are trained to comply with Brady. I don't care how they're trained. What I want to know is what your position is of their constitutional obligation. Brady defines that the constitutional requirement is to turn over ñ Brady doesn't define the obligation of a police officer. That's the reason I'm asking you. Right. They define it generally to be to turn over exculpatory evidence. That standard cannot be higher for a police officer. And in fact, because the gatekeeper is the district attorney, that's where it lies. So the police turn over their entire file, and it is up to the district attorney to decide what is exculpatory and what is not as the gatekeeper to turn it over. In other words, if something turns out to be exculpatory and the police officer has knowledge of it and didn't turn it over to the prosecutor, there's a constitutional violation on the part of the officer. Is that right? That would be correct, Your Honor, to the extent the officer, as you said, knew it was exculpatory and therefore had the intent to deny a violation. Wait a minute. Why does he have to know it's exculpatory if his duty is to turn everything over? Well, you asked me what the duty is. You said he has to do that because, you know, it's not his job to make those distinctions. The duty has to be the Brady duty, which is exculpatory evidence. I started out by asking you. You said he has to turn over everything. Because as the member of the prosecuting team that does not make the decision to turn over the evidence to the other side, the safest route is to turn over the entire file. They do not communicate directly with the other side. So if there's something here he didn't turn over, he's made a violation, a Brady violation. It's exculpatory. Right. If he has done it. Even though he didn't even know it's exculpatory. No. Under Brady. But if men shifted to the 1983 standard, it's different. You then have to look to whether they were motivated to do that, to violate the. . . 1983 only enforces their Brady obligation as far as I can tell. If you look at Daniels, if you look at Cunningham, if you look at this case authority, it says that there's a difference between Brady and when it's applied to 1983 for civil liability against individual officers. They have to knowingly fail to turn over the evidence that's going to violate a constitutional right. Sanders is one of the two inspectors assigned to investigate the Shannon murder. Correct. Right? Right. And at a time when witnesses had, through witnesses, they had focused on two suspects, Tennyson and Goff, right? Correct. Within a month of that, Chante Smith calls Sanders and tells him she was at the scene of the murder. Tennyson and Goff were not, and someone else actually killed Shannon, right? No. What she says in that conversation on the phone is that she is an informant. She has heard on the street, and she does not name Tennyson or Goff as being there or not. She names people that she believes she's heard were present. It's only two years after the conviction that she comes forward finally and says, I was actually there. That's after conviction, after appeals have been filed, after the Ricard confession. In that telephone conversation, all she says is, I heard on the street there were certain people that might have been involved. And that's it. That reminds me of something else. It's not clear with respect to the prosecutor himself or herself, but with respect to the police officer, does that duty to turn everything over continue after the conviction becomes final on appeal, we'll say? After the conviction, if the officers are acting, depending on the role they're acting on, if they continue to investigate, they have one role. If they're serving at the request of the district attorney to prepare the case or help on appeal, that's a different standard. Suppose they aren't doing either. Suppose they're just, you know, they're assigned to homicide and they've moved on to other cases. And somebody says, hey, by the way, that old case you had two years ago, you know, we found this out. They would be, if they find that additional information, they would have an investigative duty as police officers. I'm running out of time. Is there some other point you wanted to make to us? Not today. Okay. We'll give you time for rebuttal on any of that. May it please the Court. Morning. My name is Elliot Peters. I represent John Tennyson in this case, as I did below and as I did on Mr. Tennyson's habeas case in the district court. I will be responding to the two points we just heard from Counsel for Sanders and Hendricks, and then I'll be dividing time with Mr. Scott, who represents Antoine Goff. The argument we just heard made two points, that the district court did not apply the correct legal standard with respect to And we disagree with both of those points. The district court did enunciate the correct legal standard and, in fact, did enunciate a legal standard at excerpts of record, pages 56 to 58, culminating in the following language, and I believe Counsel argued to the court that the district court did not enunciate a standard. Here's what the court said. The court concludes that to prove a Section 1983 claim based on Brady against the inspectors, plaintiffs must establish only that they deliberately withheld exculpatory evidence from Butterworth. That was the legal standard applied by the district court. Now, it is also our argument that based on the facts of this case, Mr. Tennyson can satisfy any legal standard, whether it's bad faith or the intense standard correctly enunciated by the district court, because the facts of this case are quite egregious. For purposes of this appeal and a summary judgment motion on qualified immunity, the legal inferences have to be drawn in the light most favorable to the plaintiff here, the nonmoving party. Counsel said to this court that no facts support a finding of intent or anything greater than negligence in this case, and the record does not support that statement. There are three issues as to which the district court ruled that Plaintiff Tennyson can go to trial. One, the suppression and the failure to disclose a confession of Ricard, which we've heard about this morning. Two, the failure to disclose a secret witness program memo by which reward money was put in place for use in this case. Put in place or sought? It was put in place, Your Honor. It was sought. It was approved. And there's a memo in the record that it was put in place. In fact, there's a handwritten note saying the reward is in place. It was not turned over to the district attorney. It was not turned over to the defense. A cash reward available to witnesses in this case was not known by Tennyson's counsel at the time of trial. And the third item is the failure to provide information that Shante Smith gave the inspectors about that Levinsky Ricard was really the killer, that the chase started at a 7-Eleven store, which the geography of the chase becomes important in this case, but the chase starting at the 7-Eleven store to the east of the site of the murder was completely contrary to the state's theory of trial, that the chase started up on a hill to the west of the site of the murder. They did not turn over that information. In fact, in 2005, while litigating this case, notes surfaced from Sanders that said 7-Eleven Bayshore Boulevard is where the chase started. And that's in the record of this case. I can give the Court that record citation. I want to talk for a minute about the Ricard confession. They received, Sanders and Hendricks received a tape-recorded confession in detail to this murder by a man named Levinsky Ricard. He was Mirandized. Their brother, Officer Lewis, said he gave it to them. He discussed it with Hendricks. Hendricks testified that he got it. Sanders said it was paramount. They investigated it. Not only did they not turn it over to Butterworth, the prosecutor, until he happened to get it seven months later, the version of that tape, the actual cassette that Lewis gave to them, has never materialized. It's a fair inference on this record that it was destroyed because the only version of that tape is the one that Lewis kept, and then he gave it to Butterworth seven months later. And Sanders, in response to the new trial motion that was pending then, put in a declaration in the Court which said, This confession of Ricard is completely uncorroborated. But he knew that Shantae Smith had corroborated it. Shantae Smith had told him months before, Ricard is the killer, that Chase started at 7-Eleven. He put in this declaration which also said gang members, in my experience, frequently confess to crimes that they didn't commit to get other people off. And in discovery in this case, it turns out that neither Hendricks nor Sanders can name a single time that that ever happened. So the conduct and the intent of these officers, there's ample facts with respect to the Ricard confession to justify a trial in this case. With respect to the secret witness program money and the contingent fund B money, there were two sources of cash. There was $2,500 available from a secret witness program, and there was also documentation which just surfaced during the habeas case about the inspectors actually getting $1,250 in cash from a contingent fund program of the police. That happened a week after they submitted the secret witness memo. Now, the nature of the secret witness program for which the city under Monell is still held in this case, but the nature of that program makes it difficult, if not impossible, to prove that someone actually got money. But we're entitled to have a trial in this case on that issue, particularly because there is a tape recording. Another tape recording, the original of which mysteriously vanished, and only a copy appeared in discovery in this case, where when enhanced, an audio expert that we employed was able to discern the words to the effect of, if you get that reward in a conversation on the telephone between Hendricks and one of the government's main witnesses, a young woman named Messina Faolu. So there's evidence in this record about the offering of money, the offering of reward money, and for some inexplicable reason, the prosecutor didn't know anything about the reward, the secret witness program, any of this being in place. When did Butterworth learn of the Ricard confession, as far as you're aware? He learned of it. Would this have been in May of 91? It was in May of 91, and it was on the second to last day of a new trial motion, which had been going on for several days. Tennyson had made a motion. Is there any evidence that Butterworth knew about the Ricard confession prior to that time? No. How did he learn? Beg your pardon? How did he come to learn? He was involved in a new trial motion in the Tennyson case. And Tennyson, independently, and his lawyer, Jeff Adachi, had learned, they believed that Ricard might have been the killer, and they had gotten information. And they tried to place before the court a sort of hooded confession with a man whose identity was unclear, but it was Ricard. They were trying to argue to the court that Ricard was really the killer, but they didn't have the confession. Butterworth goes to the cafeteria in the Hall of Justice at lunchtime on, like, the fifth day of this hearing, and he runs into Detective Lewis. Lewis says to him, oh, you know, words to the effect, well, they have a casual conversation. What are you doing? Oh, I'm doing a new trial motion in that case. He said, amazing about that confession, huh? And Butterworth says, what? And they have a conversation to that effect. I'm not purporting to quote it, but this is they have a casual conversation. Butterworth learns about the confession. Lewis brings him his copy of the cassette, the one he gave to Sanders and Hendricks, never materialized. Sanders is sitting in with Butterworth during the hearing on the new trial motion, and then they oppose its admission in the new trial proceeding, and Sanders puts in the declaration that I've described where he says it's totally uncorroborated, which is, of course, false, because it was corroborated by a lot of evidence, including an interrogation Sanders had performed of a witness named Luther Blue, where he says, Luther, we know that this started at the 7-Eleven. You got posse-ed up with a bunch of guys. There was a pickup truck. There was fancy driving, and this truck drove backwards. All of that is completely consistent with the Ricard confession and completely inconsistent with the theory that they offered that convicted John Tennyson at trial, which didn't involve 7-Eleven, didn't involve backward driving down the street. Has Ricard been charged in the Shannon murder? Never. We actually went out. He lives in Minnesota. We subpoenaed him. We sought to take his deposition, and he had counsel, and he asserted his constitutional rights and declined to answer questions. Now, Butterworth says he informed one of the attorneys about the Ricard confession soon after he learned. Isn't that correct? I understand the lawyer denies it. After he runs into Lewis in the cafeteria, he gets the confession. He goes to court, produces it, and then immediately begins arguing that it shouldn't be admitted in evidence and it's unreliable and uncorroborated. This was during Tennyson's new trial proceedings? Goff was not a party to that new trial motion. It was just Tennyson. Tennyson made a new trial motion, had not been sentenced yet. So at least at that point, Tennyson's counsel knew about the Ricard confession. Tennyson's new counsel knew about the Goff confession because there's a reason. So Butterworth reported it to Tennyson's counsel the day he learned? Apparently. But the inspectors knew about it 7 months beforehand, and that intervening time becomes critically important because due to the fortuity that the public defender's office eventually was also assigned to represent Ricard, Tennyson lost his lawyer, Jeff Adachi, who was an excellent lawyer who had been with the case all along. Adachi had to withdraw because of a conflict. And then they went through with this. In hindsight, it's quite a bizarre proceeding to imagine. The conflict was he represented Ricard, right? He did. Well, his office did. Technically he did, but the PD's office represented Ricard. But at the hearing, they're trying to put into evidence this probably inadmissible information about how Ricard is the killer in order to get a new trial. And Sanders is sitting there in the courtroom having received that tape-recorded confession, knowing that it was corroborated by Shante Smith in lots of ways, and he says nothing. Can you solve this, the question about whether Butterworth moved for qualified immunity on the claim of failing to provide the Ricard confession? Your Honor, I can't because that's not my focus here today. But I'm sure Mr. Scott can, who represents Mr. Croft. I'll put it in my pocket. I think he'll expect to be asked that question. Do you want to give him any time? I beg your pardon? Do you want to give him any time? I think it would be a good idea right now. Let me ask you a question. What's going on in the district court with this case? Proceedings stayed? Proceedings are stayed pending this appeal. Discovery is pretty much complete. We have an agreement that as soon as there's an order from this court, the parties will, assuming it's an affirmance, will go ahead with disclosing experts, and we'll try and get a trial date and go ahead with the case. That's the plan. Unless there's any questions, I have nothing further. Thank you. Mr. Scott. Good morning. My name is John Scott. I represent Antoine Goff. May I address the qualified immunity issue regarding Mr. Butterworth? Your Honor, it seems to me or your Honors, it seems to me there's an inherent contradiction on the one hand saying, well, of course, Brady gives a prosecutor a duty to disclose its sculptural information under Brady before trial, during trial, post-conviction, but I'm entitled to absolute immunity because I'm always a prosecutor. So on the one hand, they're arguing the duty does exist, but they're entitled to absolute immunity. On the other hand, they're making the argument, well, my fallback position is, well, maybe I didn't have a duty to produce it post-conviction because, gee, I couldn't find a reported decision in 1989 or 1990 that said in a 1983 case for a Brady violation that a prosecutor had a or could be liable post-conviction under a qualified immunity theory for failing to disclose its sculptural information. And on the one hand, is the glass half full or half empty? But I don't think it's that close a call. I mean, the Ninth Circuit in Brougham v. Bogan had an issue that came up. It came up in the pleading stage in Brougham, but it had to do with post-conviction exculpatory information that came up. And the issue on the pleading stage was they did the analysis of you could be in your prosecutorial function or your investigative function, we're going to leave you to amend and see if you can amend it to get around the absolute immunity. But nobody doubted for a second that the duty wasn't well-known and well-established way back in the 80s or 90s. Let's put duty just aside for a second and help me clear this one little thing that I may be a little bit fogged up about. But apparently there's absolutely no evidence that prior to May 17 of 91, Butterworth didn't know about the Ricard confession. Right? That's correct. And the day he learned about it, he informed the court and Tennyson's counsel during a court proceeding. Right. Because he knew it was exculpatory. He also knew that months earlier. Well, he could have just thought he was being a good guy, but in any event, he revealed it the day he found out about it. To Mr. Tennyson. Yeah. And to the court who was hearing Mr. Tennyson's new trial. But he knew that Mr. Goff had been convicted and had been sentenced back in October. We're in May of 1991. He knew back in October of 1990 Mr. Goff had been sentenced and an appeal was being pursued. And I take it the record is either silent or equally clear that Butterworth did not provide the Ricard confession to Goff or Goff's counsel. Correct. Or the Attorney General's office, most importantly. And the analysis that Judge Wilkins did, and I think that the analysis makes sense, at the very least, Mr. Butterworth knew that Mr. Goff was pursuing an appeal and he knew that the Attorney General's office was representing the people of the State of California. Now, can you clear up my earlier question about Judge Wilkins does say in her order that Butterworth did not move for qualified immunity on the Ricard issue, right? That's correct. Is that? Was she incorrect? Well, Your Honor, she was. That's a yes or no. Well, in the notice he moved for it, but in the body of the pleading, he doesn't talk about it. He doesn't argue it in the brief, right? He doesn't argue it in the brief. It is in the notice. The notice says I'm asking for qualified immunity, but in the body of the brief, there's no mention of, there's no argument about the issue. But why, as a practical matter, why isn't that on the table now at this point? Let me just finish. Let's say that we agree with you that it's not raised or we agree with the district court that it's not raised. Well, what happens? It goes down. It may or may not be forfeited. We don't know whether ACT UP v. Portland survives, goes to a jury. I mean, isn't it sufficiently on the table, given the fact that it's concluded in the motion, well, maybe not argue to the district court that we could resolve it on the merits? And I addressed that issue precisely in my brief at page 23. And if I could read two sentences from my brief. You could just say it, too. All right. What I basically said is I think from a practical point of view, this Court should address the issue because it doesn't make sense. You don't object to their position. No, I don't. Because there's been too much delay in this case already. And I'm not interested in this Court doing anything that is going to further delay this case being ultimately resolved. So I would welcome the Court to address the qualified immunity issue. Mr. Scott, I have a problem with the way these issues have been sort of divided up between qualified immunity and absolute immunity with respect to the prosecutor, Mr. Butterworth. If what I don't understand is this. If he has a duty to disclose braided material, that duty falls upon him because he's the prosecutor. And if that duty continues post-conviction, why doesn't the immunity go along with it? Because post-conviction, if he's not acting in a prosecutorial function, it's a functional analysis. How is he acting? If he's not a prosecutor, he has no duty. No. What's the duty? His duty is what? As a private citizen? No. His duty is as a prosecutor, as somebody who works for the district attorney's office. If the duty is a prosecutor, then doesn't the immunity go with it? No, because, I mean, there's a myriad of cases, and I've cited many of them. And Burns v. Reed is the main court case on that. None of the nine circuits that directly control it, as far as I can tell. Well, if you look at Cooley v. Milstein, Brougham v. Bogan as the functional analysis. In Brougham, I don't think it's a holding. No. It's an observation, but there's no holding. If Butterworth had gone out on his own and interviewed witnesses and discovered Ricard's confession, I suppose the argument could be made that he was then acting more as an investigator and less as a prosecutor. But particularly with respect to Tennyson, it's clear he learns of it during the Tennyson new trial motion, and at least as to Tennyson discloses it, and to the court. That's true. So what is the precedent this court is going to be setting? That if a post-conviction, if a prosecutor is acting intentionally, going out and acting as an investigator, you get qualified immunity. But if you're just sitting in your office, not actively investigating, and somebody calls you on the phone and says, oh, by the way, I have DNA evidence to clear somebody. But the reason they call him is because they know he's a prosecutor. He prosecuted that case. Yes. And so they're calling him in his capacity as a prosecutor. Yes, but a prosecutorial has many functions. You can act as a prosecutor. You can act as an investigator. You can act an administrative function. And all the cases recognize all of these functions, and the burden is on the prosecutor when asserting absolute immunity to demonstrate that in the particular case at issue that he is acting in a prosecutorial function. The presumption is against that. I agree with that, you see. But the problem is Brady places a duty on a person only because that person is a prosecutor. So if you have the duty by that virtue, why doesn't the prosecutor's immunity go with that duty? In other words, if he's not acting as a prosecutor, he doesn't have the duty under Brady to turn it over, does he? That's not what the case is saying. That's not a Brady duty. Well, the case is referring to, you know, he has some ethical obligation or some other obligation, but, you know, the 9th Circuit case says that a person who is not a prosecutor has a constitutional obligation to turn exculpatory material over to the defense. Yeah, suppose Butterworth were retired and he's been retired for three years and he learns about this at a chance encounter at a Giants game. Then my opinion would be that if he's no longer employed as a district attorney, he's acting as a private citizen. But as long as he isn't employed as a district attorney, why is he any different than a police officer? In fact, I would argue that he has a greater duty than a police officer in those circumstances to turn over exculpatory information. Well, the police officer's duty, I think, is only to turn the information over to the prosecutor. Yes. So what does he do? He says, here, I'll give myself this piece of paper. No, he's going to give it to the attorney general's office, who he knows is handling the appeal. Because in this particular factual situation, as to Mr. Goff, and I understand how it's easy for the court to say, well, geez, in the Tennyson case, he was such a nice guy and he did the right thing. He turned it over to Mr. Tennyson right away. Should he be punished because he didn't give it to Mr. Goff? Well, yeah, he should be punished because he didn't give it to Mr. Goff. Don't assume that the questions, at least for me, that I've asked to this point, excuse anything related to Goff. All right. I was focused on Tennyson. But in my view, Your Honor, ultimately it seems to me you're looking at a huge policy decision. And this Court has recognized, there were comments here earlier today, that it's not unusual that a prosecutor post-conviction may become aware of exculpatory information. And it seems to me what could be more fundamental to the whole idea of Brady if everyone recognizes that post-conviction, for a number of reasons from a number of different sources, whether it's DNA information, whether it's some gang member rolled over, whatever, a prosecutor now, whether it's a day after the conviction, a year, ten years later, becomes aware of exculpatory information. I guess it gets down to the point of whether the sanction is the loss of the conviction or civil liability. Absolutely. So for example, though, I mean, to take your – this case, if he had remained as the prosecutor on appeal, absolute liability attached to him. Definitely. No doubt about it. But he didn't. So what sense does that make in terms of your analysis about the Brady duty to disclose post-conviction? Let's assume, for the sake of argument, you've got a Brady duty post-conviction. And here you have the only difference is that he's no longer on the case and it's still pending. Yes. What public policy purposes serve by saying that's a functional difference, that he's no longer acting as a prosecutor? Well, the functional difference is if you're not acting as a prosecutor, you're not acting as a prosecutor. At that point, he has no duty to act as an investigator either. That's not his function, is it? District attorneys rarely have a duty to act as an investigator. They may, not necessarily. Well, if he doesn't have the duty, then what is his liability? His duty, I believe his liability comes down to, I mean, you believe it or you don't. My reading of the case is the Brady obligation exists post-conviction. And my reading of the case is if you aren't functioning as a prosecutor in any other capacity, whether it's investigative, administrative, whatever, if you aren't acting as a prosecutor, you are not entitled to absolute immunity. You are entitled to qualified immunity. And nobody says he can't raise the defense of qualified immunity. And nobody says he can't go to trial and defend himself. There's policy reasons why prosecutors have absolute immunity, because there's a lot of judgment calls that are made during a prosecution, and we don't want to be second-guessing judgment calls that prosecutors make during the prosecution of a case. Does that include decisions about Brady? Not post-conviction. Oh, but you're talking about during the trial. He gets absolute. Yes. Brady violations happen all the time before conviction, and they get absolute immunity. And we give that to them because they're acting in a prosecutorial function. But post-conviction, if the prosecutor remains on the case, absolute immunity attaches. Yes. So that's the conundrum of this case. First of all, there's a pending appeal, which he arguably, I suppose, could say he was involved because he was, you know, one could say he was arguably involved. But, two, he's acting as a prosecutor in another case when he gets the information and discloses it. Yes. So it's not a clean case for any theory, I don't think. I mean, it's not a case where the person for – let's take a different hypothetical. Let's say that he's, you know, he has – the case is over. I mean, the appeals have progressed. He gets new information. Now, arguably, he might be acting in an investigative capacity at that point because he's no longer prosecuting. That's a theory, the function. But here, the functions seem to be all mixed up. It's very – it's very – it's not a clean case. Well, it's only mixed up because Tennyson and Goff were tried together. But for the Court to say that because a decision was made to try Tennyson and Goff together, which they didn't ask for, and they had their own cases and they chose their own lawyers, to have a rule that's fashioned that says, well, if we're – if there's a joint prosecution, we're going to give you the benefit of absolute immunity, but if there's not joint prosecution, you don't get it, seems to me like a rule that doesn't make much sense. Nor does a rule that says you – just because if you – if he takes the appeal, he gets immunity. If he doesn't take the appeal, he doesn't get immunity. Well, I disagree, Your Honor. I think that rule makes a lot of sense because you're acting as a prosecutor. You're acting as a lawyer. You're doing an appeal. Yes, but here's – the complicated thing about this one of many is that it's the same case. You've got the different defendant. He's involved in the same case. He's just involved in a new sentence hearing on one of the defendants. He's given up that part of the appeal, the Tennyson appeal, to somebody else. But he's still prosecuting that case. I realize it's a separate prosecution. Which is why Judge Wilkins said he was entitled to absolute immunity, as to Mr. Tennyson. I can't – I can't argue it any better. I'm sorry. All right. Thank you for your argument. Put 5 minutes on the clock. Now, we ordinarily don't let you divide rebuttal. But if you get a question and you get to a point that requires your co-counsel to respond, I think we'll allow that. I'll address the Ricard confession first, and maybe then counsel can tell me if she needs time. The point I want to raise for the Court is that the Court, at the new trial motion under Mr. Tennyson, fully considered the tape. Although it was provided towards the end of the hearing, it was actually a month later that the Court actually ruled and gave parties a chance to brief the issue, submit declarations. The Court found that the tape and the content of it was unreliable and had internal inconsistencies and inadmissible. That was upheld on appeal. Also, Mr. Butterworth's position is he turned the tape over to Goff's counsel. It was upheld on appeal but overturned on habeas. Correct. But that's the factual background. As to Ricard's confession itself, Mr. Peters raised some issues that I want to clear up for the Court. Mr. Tennyson testified at the new trial hearing that he was aware of Goff's confession – I'm sorry, Ricard's confession to the police when it happened, even before he got the tape. Also, Mr. Goff testified in this case that he knew about the Ricard confession even before he was arrested. He knew about the 7-11 theory before he was arrested. So this was nothing new to them. How could he know about the Ricard confession before it occurred? Not the confession to the police. He was on the street and Mr. Goff confessed to him. He was in a group of people where Mr. – I'm sorry. I just assumed when we were talking about, quote, the Ricard confession, we were talking about what was given to the – to law enforcement, not some street talk. It goes to – it goes to the issue of whether it was material or not because he was aware that Mr. Ricard had said he committed the murder. But that's a factual background. On the secret witness information, there was no one who has testified that that money was offered to them or that they received it. And moreover, when he says that wasn't turned over to the prosecutor, it actually was found in the file that was available to the prosecutor, as was the Shantay note. So this information was put in the file, turned over to the prosecutor, and that's what happened. The Ricard tape, it was not given to Mr. Sanders – Inspector Sanders. As he said, he sat in the courtroom and was aware of it. There is no evidence that Inspector Sanders was ever aware of the tape. Any communication occurred between Officer Lewis and Inspector Hendricks. And the timing of that, Officer Lewis does not remember. He remembers turning in a tape, slipping it under the door of the Homicide Division without actually giving it to anybody. Any conversation we've had with Hendricks, he can't place in time. As to the issue of intent, Mr. Peters cited the court's opinion. And as you heard, all the court said was that the intent requirement was that they deliberately withheld evidence. But the court didn't define what deliberate meant and then cited to Daniels. The Supreme Court case that found that negligence was not enough, but it did not say what is deliberate. And that's the issue before the court. The plaintiffs want the standard to be a general intent standard because there's no dispute that negligence is inappropriate. They want a general intent requirement. That means if the police officer knowingly did not give a piece of evidence but didn't know it was material because they were negligent, they would find that to be something that entitles them to a 1983 liability, which is specifically what is not allowed by Daniels. So the point is what is deliberate? And the authorities point towards bad faith, to an intent to deprive of a constitutional violation. There is no evidence. In fact, regarding the Ricard tape, the district court here found that there was no evidence that either Sanders or Hendricks took active steps to conceal that tape. The court said that. Do you want to give some time to your co-counsel? No. Do you think you're doing okay? As to the secret witness memo and the Sean Ted tape, I would point out that those exist and they were found in the file. Again, no evidence of bad faith. Evidence of bad faith would be that they destroyed it, they suppressed it. Here it was available. Hendricks denied that it existed and then he was confronted with it at his deposition and finally said, okay, I agree. I admit that it happened. I believe Inspector Hendricks testified that he was not a part of actually requesting the secret witness money. That actually was drafted by Inspector Sanders, who signed off both their names because they were a team. But Inspector Hendricks testified he didn't have a part in that. There is no evidence that it was offered to anybody. Again, it's not material. Again, if the intent is bad faith, the burden lies with the police plaintiffs to show that there was motive to suppress that. The fact that there is no such evidence. Well, I think it's your burden to show the immunity. No. We have our ‑‑ if we have made a case that in fact they acted properly and we have presented the evidence of how the facts laid out and how they got the memo, how they produced it, they then have to come back and give evidence of intent. And simply the failure to turn over the evidence is not evidence of intent. Something greater than that has to happen. That's what Jeffers said. You have to look to ‑‑ So what do we do at this stage in summary judgment? We have to construe all the facts most favorably to the nonmoving party. Correct. As Jeffers states, and they have to, doing that, looking at the material facts most favorable to the plaintiffs, there's no evidence that their motive was bad, there was intent to deprive a constitutional right. Okay. All right. Thank all of you for your arguments. It's a very interesting case. And I suppose in some respects it speaks to the really difficult job that public prosecutors have to keep an open mind and not focus on a single theory of the case so that justice is ultimately done. The case to start will be submitted and we'll stand in recess for the day. All rise. This court for this session stands adjourned.
judges: Hawkins, Tashima, Thomas